At least because my name is Michael Helms, I represent Jim and Jody Hamlin as men. Location, location, location. It's what real estate people say every day. It's common, it's standard in that industry. Just as the follow-up, the follow-up, the follow-up is standard in the industry. We're talking sales, in this particular case, home air conditioning. We're actually in sales of any expensive equipment. Along with the follow-up. The follow-up wasn't the only thing. It was follow-up in context of a lot of other statements that appeared in the same order. He has permission to ask questions. Build back. Difference between persistence. All of these statements were claimed to be copyrighted and copied by Hamlin and his publication from the ACT publication. Rules for asking questions. Start with open-ended questions. All of these were in the testimony at trial. Served to be common, standard statements, comments, phrases used in this industry. Industry of training, salesman of air conditioning equipment. Jim Hamlin testified that these were all common phrases. Mr. Howard, the president of ACT, confirmed that all except the one were not original with him. That they were all standard, common in the industry, and have been for 25, 30 years. And the only one he said that he originated, in fact, was follow-up, follow-up, follow-up. That he also testified was, in fact, by the time that Mr. Hamlin created his materials, common and standard phrasing in the industry had been for at least 25 years, according to his testimony. So every phrase that we're talking about in this case is a phrase was common, standard in the industry. One of the issues here is that the court, the trial court, did not instruct the jury, as he had been requested, that common, standard phrases are not subject to copyright protection. So how does the instruction that the trial court gave on originality fall short of what you think the jury needed to have in order to make a proper determination? It doesn't go so far as to say, for example, in this case, Mr. Howard testified that ACT, he only ever had to create a follow-up, follow-up, follow-up. The jury could easily say it's copyrightable because it's not, because they're not instructed, even though it became a standard phrase in the industry, that it was not protected by copyright. But they were told that ideas could be copyrighted. I mean, they were told that ideas and concepts can't be copyrighted, and then they looked at these documents that didn't just have some phrases, but had them in the same order and the same context. So how, I mean, I guess I'm struggling, but both things, how is that not covered by ideas, first of all, and then second of all, how is it not in some way harmless, because that's not really what the documents, that's not the only issue in these documents anyway? Well, the issue in these documents, that's not the only issue, but that was certainly the issue that was presented to the jury. That is the de-phrases are what makes the analogous materials infringing on ACT's materials. It's de-phrases, and that's what the jury was told to focus on. Who told them that? Who was also told to focus on ACT's films throughout the trial? That was the argument, and that was what was questioned by the witnesses, and that was what was argued to the jury. These phrases are all copies from each other, even though if you look at each phrase and each material, they're phrased differently, they appear differently, they contain similar ideas, no question about it, but those are common standard in the industry. What the jury here was allowed to do was to take something like follow-up, follow-up, follow-up, and say, well, that's copyright infringement. But, in fact, it's not because copyright protection does not apply to those kinds of phrases, the common standard. Why wouldn't they have looked at that instruction and said, this is not acceptable? It just doesn't go far enough. Even though, for example, Mr. Howard said, I originated follow-up, follow-up, follow-up, it was by the time it was ever used by Mr. Hamlin, common standard stock in the industry, the jury wasn't told that. The jury was simply said, if it's original, and Mr. Howard said, well, if it's original with me, then we can say that that's infringing. They weren't told that once it becomes standard, common stock in the industry is not protected by copyright. The copyright is lost. The copyright is lost once it becomes standard or stock in the industry is. So you can't copyright the order and the presentation of these phrases that are common? The expression of these ideas can't be copyrighted. Isn't that what the allegation here was the materials were basically listed, isn't it? That's what the allegation was. But if you look at the phrases, they're different. They are different. The extent of difference, the weight to be given to the difference, the probativeness, isn't that what the jury had before it? And they also had the other factor, which was access to the copyrighted work, which obviously he had. It was the invention. It was the invention he had, and then he had it when he produced it when he developed it, his own competing manual. Access was not an issue. Access was conceded before the jury. There's no question that Mr. Hammond had access to Hacks and Interrogants, but he didn't copy them. He used similar ideas in many cases. He phrased them in most cases. The phrasing is different in each country. There's somewhere that shows a different phrasing. Let me look at it. I do. Wait a minute. It's in the brief. There is a page 22 and 23 of our opening brief. The hacked expressions are on one side. The inland expressions are on the other, and they are different. They express similar ideas, but they are phrased differently. That makes it non-infringing. It can convey the ideas because the ideas cannot be calculated. The systems cannot be calculated. One of the things that Mr. Mueller testified to in his testimony, Mr. Mueller was his general manager, was that, yes, we are trying to project a process. This is a process, and it's what we're going to project. Did you disclose anything about the presentation on pages 11 through 13 of their brief, their in-brief? I don't have that with me. I do. I think I did. It's in the brief. Where is it? It's in my brief. Where is it? I have it in my computer. I have not printed it out. It came off of there. No sense. It looks like it. Those pages have rules for asking questions. It compares the two with the list and follow, follow, follow with the list underneath. I mean, do you remember those pages? I do. Do you dispute anything about how they show the same points in the same order in the same list? They are not presented. If you look at the whole picture, their publication, Hamlin's publication, look at where they are, how they're presented in those publications. They're different. Even the phrasing in some of those phrases is different. The punctuation is different. The words are different. They're similar, and they're close. But they are not exactly the same. Is there any real possibility that someone could create the Hamlin materials without having thought about the works or seen it? I mean, it's just random. You end up with the same list with slightly different words, but basically the same points in the same order over and over. Absolutely. How would that happen? Mr. Hamlin was teaching this material for 30 years. Right. And how did he get it from using their materials? Well, he used Hamlin as if long before he ever saw them returned. How do we know that? He testified to that, and that was not just good. He testified that he'd been using these phrases for 30 years. He'd been working for ACC for something less than 10 years. He knew these phrases. This is what he had taught, and that's why he was employed, contracted with ACT, because he was good at this. Well, I see that you really don't believe that. I thought what he did is he took the errors and jumped the words out of a commercial site, which is crazy. He's… Would that be unusual? The expression is different. No, it would not be unusual. The copyright protects the expression of an idea that does not protect the idea of the concept or the process. So you can take a novel and change a few words and print it again, and it's not the same expression. I mean, that's a huge question. It makes big homework, right? They change one word out of five, and then everything else is the same. That's not plagiarism? It depends on how much it's changed, what's changed, and why it's changed. I mean, you have to look at it, and the jury had to look at it in this case. The problem here was that the jury was not totally common every day. Expressions, stock expressions, are not subject to copyright. So they're looking at all of this, and they are not involved with the restrictions and the limitations that the copyright protects in order. And that was the problem. But let's say we think that the instructions were not a peaceful expression. Do you have a sufficient evidence argument to prove that? I do. I did argue with the sufficiency of the evidence, because I did my followings with the source. Yes, it is in the brief, the sufficiency of the evidence. And we talked about the differences between the two productions, between Kamen's production and Mannick's production. I did argue with that. Since you don't have your brief, why is it not on the pages? I do want to address a couple of other points, and one is the disclosures in this case. Plaintiff was allowed to use witnesses, exhibits without any disclosure in this case. In your writing, if you indicated any prejudice to you from the points that the trial court made, which limited all of the ACT evidence because it had been already produced in summary judgment for his discovery. There was a limitation that was requested by Waterford, which was in the case of Tutankhamen. It was not requested by me. I did not argue with that. The court had ruled on that. I have a prejudice. Okay, go ahead. What was your prejudice? The prejudice was that ultimately the court said, when we objected to Exhibit 121, which was an exhibit, that it was used by ACT to establish their damage claim. We objected to that because it had never been disclosed, and the trial court said, if you take a weekend, go home, get your materials, go back and see what you can do. I thought it was the deposition of flowers. It was, but it was never disclosed as anything that was ever going to be used in a trial. But the judge said that things that came out in depositions were disclosed, and often you knew they were an issue, and those are the only things we're going to allow you to use. He did not. There is no way we can know that was an issue because it had never been disclosed as something that would be used to support any of the claims in this case. It came out in a document production, some 50,000 documents. The document comes from Waterford, sometime before terminal. And it was used in Albertson's deposition. It's over a lot of other things. There were over 50,000 documents in these days. But there's no such thing as an exhibit in a deposition that was adequate notice that it was an issue. So I guess you disagree with that, but can we say that's an abuse of power? That did not raise the issue. It was simply a question of discovery. Discovery and disclosure are different things. The disclosure rules require the disclosure of certain things. Among those things, the identity of witnesses, so the witnesses that testified at trial were never disclosed as witnesses. The subject matter of all the witnesses, none of which was ever disclosed by the plaintiffs, the exhibits that are going to be used. So is the prejudice on the exhibit 121 that we answered in the charter discussion? 121 and 22 undocuments testimony of two witnesses, which was Mr. Albertson and Mrs. Howard, either of whom had never been disclosed. But they were deposed, right? And they were limited to what they'd been deposed on? Mrs. Howard had been deposed, and she was limited. That's rude. It does not tell us how to prepare for trial because we don't know what's going to be used at trial. She was never disclosed as a trial witness until the final pretrial statement. The disclosure rules, in Rule 37, says, if you don't disclose it, you can't use it. There is a self-executing rule, and simply says if it's not there, you don't use it. This court has said the same thing. All I'm asking here is that the court enforce that, which the court said it was going to enforce. Can I ask you a question about your counterclaim? Yes. Why is there federal jurisdiction over your counterclaim? It is the Hemsley jurisdiction. So how does it share a common nucleus of facts with the copyright claim? It all comes out in the same relationship. Are they the same facts about the relationship then? No, they're not. Would these kind of claims commonly be tried together? Yes. Why? Because I think it's mandatory counterclaim. Why? Because it comes out as a claim between the same people in the same relationship. It was not. Any similar case where really quite different aspects of an employment relationship had to be tried together? Frankly, I would look at that issue because there was an issue before the trial court. The trial court did not dismiss the counterclaim on the basis, I can't think of a basis at all, simply dismissed the counterclaim on summary judgment on the basis of that. It was instilled on the basis of economic damages. And there was no economic harm even claimed by Mr. There was none. There was none. And Arizona law in the rate case says you don't need economic harm, you don't need special damages under Arizona law to make a claim for invasion of privacy. But this wasn't invasion of privacy, right? It was a corporate one. What's the name of this claim? Is it a... Sorry, I'm forgetting the name of your claim, but is it a non-invasion of privacy? It is an invasion of privacy. I thought it was a commercial publicity or something, isn't it a different claim? That is an invasion of privacy claim. Did Arizona law make a distinction between the two? No. If you look at the rate case and the later case, there's a case that was cited. So what do you do with rentals? Rentals, rentals, also rentals, yeah. Such rentals that you need to have show that there's a commercial injury? No. Rentals said nothing about that. Rentals did not overrule rate to make no comment about economic damages. The rate did make no attempt to overrule rate. And simply dismissed, affirmed the dismissal of the plaintiff's case in that case because the plaintiff made a type of a claim about economic damages that was specifically permitted under the statutes. You have less than a minute left, James David. I'll see you here. Thank you. Do you have a case in court? My name is Maria Speth, and I'm here on behalf of the Act Group. I will be addressing the copyright issues, and then I will defer the last ten minutes to my colleague, Jusie Showalter, who will address the Calmer claim and the rightful dismantling. Nine jurors in this case unanimously determined that Jim Atlin will fully infringe the Act Group's copyright materials, and there are no grounds to disturb that verdict. Well, do I get a number of counts? Yes, you do. Why isn't there a insufficiency argument? We have either a copyright protective suppression or not meeting, right? Correct. So why isn't the entitlement to go through and change the phrasing and create a new work that way? You would be entitled to go through and create a new work with new phrasing. That's not what we have here, Your Honor. The original book was a thick book this big. This was the Act Group materials, and in some cases, the entire pages of Mr. Helms' materials, the entire page were verbatim from this book. And so one example of that, Your Honor, and Mr. Helms talks about follow-up, follow-up, follow-up. That entire slide, Your Honor, which is PR 1795, from beginning to end, every single word on that slide includes... PR what is it? PR 0G95. I think it works. PR 1795? Yes, PR 1795. Yeah, there was a lot of money on that. I just don't trust this. Okay, let me tell you. Read it. Okay, 1795? Yes. Okay. Yeah. First thing, Your Honor, if you look at PR 1893, which is the Act Group materials...  Your Honor, I didn't follow. Okay. Yes. Perfect. So, Your Honor, if you look at that and you flip back and forth between PR 1795, which is Mr. Helms' materials, and then the Act Group materials, what you will see is although not... Okay. Flip back and forth. Give me one page. Oh, yeah, the first page was 1795. 1795 is the Hamlin materials. 1795. And what's the second page? 1893. 1893. Okay. And although Mr. Hamlin doesn't take every word from the Act Group's page... Is there... Is there Mr. Hamlin's material in 1893? Yeah. No, that's Mr. Hamlin's material. Act Group is... This is the Act Group. So it's like water furnace. Water furnace is Mr. Hamlin's material. So I'm confused. That's why I was confused. Because it says 1893, water furnace. I thought that was his stuff. I have 1795 as well. So I have it backwards. I apologize. I may have it backwards. So the one that starts off as you don't close... I was, and when I looked at the actual pages, I must have written it down backwards. I have it down backwards. I'm pulling it up right now. The one I have has the Gates number at the bottom. Can you pull that up for us? So they both have Act Gates numbers. Act Gates numbers. So now we are now looking at... whose material is it? So what I want to compare is I want to compare Mr. Hamlin's materials to ours. Yeah, yeah, yeah. I'll talk in two sentences. Tell me whose material you first want to talk about. So we're on the same page. Right. So now I'm concerned that my number's wrong, but I had ER 1893 as... I asked you a question. Plaintiff or defendant? Okay, so... Let me see. One of those two things. The plaintiff's materials. Okay, the plaintiff's materials. And you think that's okay for it? 1893. 1893. 1893 is something that says water furnace on a sideways page. This is water furnace. Then perhaps 1795. Maybe I have them backwards. Do you actually look at the page? Do you have the page? I have it. I have it on the computer, Your Honor. Okay. 1795 is a page that goes... That goes. Four turns. And it goes, if you don't trust... Yes, Your Honor, that's plaintiff's materials. 1795 is the plaintiff's materials. Your Honor's materials. Correct. Correct, Your Honor. And then 1893, that says water furnace at the bottom, is each of the defendant's materials. They look very different, Your Honor. Yes, Your Honor, unless you look at the order, Your Honor. I agree that they look different, but if you look, it says if you don't close, you have a commitment, but if you look at a little further down the page, every single... Further down the page. On 1795, it says follow-up, follow-up, follow-up. That's on 1893, follow-up, follow-up, follow-up. Okay. The next thing that's on there, know the difference between being persistent and being pushy. That's verbatim on Mr. Hamlin's materials. Okay. And he leaves it out. Persistently, you will always have a reason to confer. Correct. He doesn't take everything. That's correct, Your Honor. Call whenever there is new information, verbatim. Call when there is new information. Not verbatim. One says when and one says whenever. Okay. Don't send additional information. Drop it by. Don't send additional information. Drop it by the house. Both have the drop it by in quotes. Follow-up is your responsibility, not your customer's. No, it's not. The previous one is the best one. So, again, we're doing quotes in quotes. Well. And one that has to have the discounted number. Yeah. Can you drop it by? You can't send an added to one added. Well, he did. He grabbed the quotes on one and he didn't on the other. Okay. Okay. Well, I think it's interesting that drop it by is in quotes on both, but I don't know why that would be in quotes if the letter was copied. Also, follow-up is your responsibility. The information is not in quotes. It appears to be. That is true. Follow-up is your responsibility, not your customer's. Follow-up is your responsibility, not your customer's. So, Your Honor, my point is, every single thing on Mr. Hamlet's slide comes exactly. He was spelled as customer's. I suppose that is true. He does. He does. It leaves out the apostrophe. That is correct, Your Honor. So, that error he didn't get from us, he made that one on his own. On the, Your Honor, that's just one example. There's another slide, that's ER 1715, that is perfect. Your Honor, every single thing on Mr. Hamlet's page is copied from our page. Every single thing. None of it is original. I understand that if you look at the act group first, what you see is that there are other things that he didn't copy. There's no requirement that he copy everything. Everything that he used, he got from us. Same thing on this slide from ER 1715. Sure. What he did was he took phrases that were somewhat different and highlighted those as a good advocate would do and ignored the verbatim copy. But if you look at our brief, Your Honor, you'll see page after page after page 17 on verbatim copy. I'm sorry, it's page 11 on slide by slide, slide by slide, slide by slide. So, from page 11, 12, and 13 of our brief, Your Honor, so, certainly, a reasonable jury had sufficient and substantial evidence to prove that this was a privilege to be found and find that there was copyright infringement, and it did. Your Honor, the appellant also raises the issue of the insufficiency of the jury instruction, and the jury instruction that Mr. Hamlet wanted about Hamlet's soft phrases. Correct. He changed them. No doubt, Your Honor, that he changed those entries. I'm not sure if it matters if he changed the meaning because it's not the idea that's projected, it's the expression, but he did change the expression. But whether or not he took the idea is not something that I'm here to argue about. He is allowed to take the ideas. The law is very, very clear that he can take the ideas, but he cannot take the expressions. And copyright law requires that you take your constituent original elements. It does not require that you copy all of it. And we never have contended that he copied all of it. Right. And, Your Honor, this case is not about soft phrases. It's about taking entire pages of his materials from our materials, page after page after page. It's not about... But if all of those exist as soft phrases, if it comes from the public domain, you can't do copyright law. Every word comes from the public domain. It's the way that we string them together that gives us copyright protection. And the way that I actually strung these words together is what was copied and why there was an infringement and why the jury determined that there was an infringement. And, Your Honor, I see I have only eight minutes left for Mr. Schumel to address the camera claim. And I want to obviously honor your and respect your wishes here, but I also want to step on Mr. Schumel's toe. So if I can turn it over to Mr. Schumel to address the camera claim. Or do you want me to address another question? Good morning. I'm here to please the court. I'm Jesse Showalter, representing ACT. I'm arguing for ACT with respect to the counterclaim. The district court correctly claimed in summary judgment that the public's right of publicity counterclaim. And there's two reasons for that. First, and most significantly, the public failed to show any economic damages. And Mr. Helms discussed that, and he says that he hasn't paid to because of greed. Greed's a very different type of claim. And Reynolds makes that clear. And Reynolds, the court says in paragraph 10, the tort of appropriation. And Reynolds says that the right of publicity and the tort of appropriation of likeness for commercial advantage are the same thing. He uses those terms interchangeably. He says the tort of appropriation affords redress of commercial injuries by contrast to personal injuries of disorder remedied by a claim for, e.g., invasion of privacy by intrusion or publication of private facts. Greed is that type of claim. It's not a right of publicity claim. It's a... It seems like they're a little bit obscure in what the actual injury was, but it seems to have been a false line invasion of privacy case where a private plaintiff's image was published in a newspaper article relating to a crime. But the court, writing in, I think, 1937, doesn't make clear what exactly is involved. What is clear is until Reynolds, Arizona never recognizes a right to publicity, is when Reynolds is setting forth the scope of the tort. This is... I'm talking about you as a lawyer. You said something I said in the jurisdiction. It's a political jurisdiction. I'm going to say something I said in the court. Yes, I do, Your Honor. I heard it. It's a concluding... It's a concluding judgment. I'm going to ask you a question. Yes, because there's nothing in the record... And the conclusion, I understand, of course, is if there has been a jurisdiction as per your judgment, so why was there a jurisdiction? Why was there a jurisdiction under 1367? It's a political jurisdiction, and this was never briefed or argued. So... It's a judicial jurisdiction. It's a judicial jurisdiction. You have a duty to make sure you have a jurisdiction. Thank you. Um... Did you come up with this yourself? The issue is a spot for it. It's very much a spot for it. Um... The comment that we hear is the separation of these... of Mr. Hamlin from the anti-corruption group. Mr. Hamlin worked for the anti-corruption group from 2002, as an independent contractor, until, I believe, 2011. So nine years in, it's that... that common nucleus of facts is what it has in common. So that employment statute of employment is a common fact, but is there any other common facts, any of ones that we've got these two sets of training materials we have to compare? And then the other, we've got this photo and ad and whether it damages. I mean, I really am having trouble seeing how the facts are the same facts. Well, and I think what the courts should understand is... is I would focus not just on the... the nine years, but also on the... the destruction of the relationship. And so this relationship comes to... It's clear that there's a lot of animosity between these parties, but that's not related to the elements of the claims either, really, right? No, but... but that... that disruption between the two parties, it does not make sense from a judicial or economic perspective that any time there's... I mean, you see business divorce cases all the time. Every time that happens, it makes economic sense for the courts to understand that disruption as a single event and not to be trying these cases all over multiple jurisdictions because what could result from that is sort of inconsistent rulings where somebody... somebody has to... try one case in state court and one case in federal court, and all of a sudden, the amounts owed, the issues could be... could have very different results. Is there any possibility that something about the ruling on the Philippi Wright claim and something about the... ruling on the... the advertising claim could be consistent? Well, I think... I think there certainly could, and... I don't know, in this particular case, if there's any overlap between that, but there certainly could be an overlap. What would that have been? I mean, what could that have been? Well, what it could have been is you could have read documents in which there's a claim for copyright protection as well as an image of Mr. Hamlin, and there could be some overlap there where the courts are actually looking at the same documents and saying that, you know, for instance... If you're so sure it was on the train of adjustment. Exactly. That's not the case here, right? You're right. That's not the case here. But if... if there were one side, there's no... there's no possibility because there's no evidence. There's nothing... there's nothing that you see. I mean, you could win on the one and lose on the other. But as a person, there wouldn't be any inconsistency between... between those judgments. Well, I don't know that that's the case, but what I... Well, okay. What I do know... Well, that's important. What you know. The question is, tell me why that's not true. And you think that's not true? I think... I think the issue is that... Well, you know, you want to talk about something else, but why don't you tell me what I asked the question about? And this... this hasn't been briefed at all. I'm like coming in cold and I don't have an answer to your question. Don't frame this. You can't think of anything? I can't, off the top of my head, without having looked at the issue. Is there an overlap and aligning between the use of this image on the advertising materials and his use of the training manual that was approved at a trial to Ben and Virginia? Absolutely. Um... He left ACT in 2011. It appears that the images remained in use by ACT until 2013. Well, I thought that would have been true if, uh, if they had hung on his dog, too. So while he's using this material, he used to come to me and talk about it with his dog. It would have been kind of pretty obvious, but that... that doesn't mean much, does it? Well, I... I think it's very different here because what you have here is these two parties whose interests in their commercial... in their intellectual and commercial property parties are vast because of the, uh, contractor relationship. And then that contractor relationship implodes and they're arguing over various pieces of that. And so it... I mean, I'm gonna go back to that. It's that there is this nine-year-long relationship. So what did he... if he claimed while he was working at ACT that somebody contacted the contagious disease, uh, uh, uh, you know, his work conditions, you know, if they were careless and, like, contacted this... this contagious, uh, this, uh, this, uh, illness, which is now causing all these, uh, all these problems. Did you see anything with that? Would that be, you know, someone's, uh, is following up on that? No, I don't think so. I think... I think there's no... I don't think... Why not? Because... There's one that's... there's an intellectual property of the one who's... No, I don't think so at all. I think you have an independent... an interest that's completely independent and really unrelated to, uh, the relationship. One other thing I'd like to highlight for it is that when this case was initially brought, there was a state law but didn't... state law claim that you had breached the duty of loyalty. Um, and so I think that it also may have played a part, um, that it would have but, um, um, I don't know as I stand here before you. Um, I...  how it was, uh, I don't know if it was dismissed, um... A trial? A court trial? Yes. How is that related to the case? Um, is that relevant? No. If... if there's in a jurisdiction or something in a jurisdiction over the duty of loyalty claim and it's brought against Mr. Hamlin and he's, uh, breaking a, uh, a responsive claim, uh, a counterclaim, a state law counterclaim, I mean... Was that duty of loyalty issue about the publicity of the advertising? No, it was not. It was, uh, it was similar to the, the, uh, it was essentially that, uh... A state law version? Yes, essentially the state law version of the copyright issue. Yes. So that doesn't really help, I think, right? It doesn't bring the facts of that claim, but it sounds like they would have any more overlap with the publicity claim than we have with the copyright one. Well, I think the distinction I've made is that if the court's already exercised a jurisdiction over one independent state law claim and then an additional state law counterclaim is brought, um, again, if it was speaking on proficiencies and the idea that we have this central relationship between the parties that's fractured and the parties  over it, it should be handled as a single matter. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. That was a very concerning infringement here, and the fact is we don't know. We don't know if it was because they found that standard stock phrases infringed under copyright or not because they weren't given that instruction not to consider that. That's the problem. The jury also was able to consider witnesses, testimony, exhibits that had never been disclosed and should not have been allowed and tried. What evidence was there that these were standard phrases? I'm sorry? What evidence was there that these things that you claim were standard phrases? The testimony of Jim Hamlin said he had been using these phrases for 30 years. That testimony was confirmed by HAC's president, Mr. Howard. He, on every one of those that we asked him, was that a standard or stock phrase? He said, yes, except for follow-up, follow-up, follow-up. He said, I already stated that, but it was certainly stock or standard for 25 years before Mr. Hamlin. That testimony was then contradicted. But these are stock standard phrases. Why is that of such critical importance when it is the arrangement, the selection, the positioning of those phrases that he has determined that he and others have been copying, recognizing as the Arizona courts have, that training manuals and maintenance manuals are sufficiently original? Because if they use stock phrases, those stock phrases are not subject to copyright infringement. That is, and that this court has said in, if I pronounce right, Santa Barbara, Santa Barbara,  Barbara.  in 2003. I was in 2003, and it has not been questioned since. So why was ACT's training manual a constitutional institution? Not the whole manual, but the stock phrases can be changed by the training manual. It is not    I think that was the key point. I don't think it was a constitutional institution. I think we are trying to  this institution a better institution. Thank you.
judges: Kozinski, Friedland, Arterton